## HOWELL, JEWETT & CO. v. ROBERT McCRIE.

1. HOMESTEAD — *Mortgage, Without Joint Consent of Husband and Wife, Void.* Where a mortgage of the homestead was executed by the husband, and to which he signed, or procured some one to sign, the name of his wife, and then procured a notary to certify to its acknowledgment by the wife, when in truth no such acknowledgment was made, and after an interval of six weeks the wife executed an instrument attempting to ratify the mortgage, *held*, that the mortgage creates no lien on the homestead property, not being given by the joint consent of the husband and wife, as required by article 15, § 9 of the constitution, and that it is void.

2. CRIMINAL ACTS, *Incapable of Ratification.* Where, six weeks after the husband had signed, or procured some one to sign, the name of his wife to a mortgage on the homestead, and had procured a notary to certify to the acknowledgment of the same by the wife, when in truth no such acknowledgment had been made, the wife, in the absence of her husband, and at the solicitation and upon the representations of the notary, signed and acknowledged before another notary an instrument attempting to ratify the mortgage, *held*, that the act of the husband in signing the name of the wife to the mortgage, or procuring some one to do so, and the act of the notary certifying to its acknowledgment, when in truth no such acknowledgment had been made, are criminal acts, and are incapable of ratification.

3. MORTGAGE — *Questioning its Validity.* Any party to the action claiming a lien on the homestead property can properly raise the question of the validity of such a mortgage.

### Error from Atchison District Court.

ACTION brought on October 24, 1884, by *Robert McCrie* against Samuel A. Stoner and Nannie E. Stoner, his wife, to foreclose a mortgage and enforce a first lien on the premises described in the petition, the same being the homestead of the defendants. G. C. Hixon & Co. and *Howell, Jewett & Co.* were made defendants, they being judgment creditors of the mortgagors, and claiming liens on the premises for improvements thereon. *Howell, Jewett & Co.* stated, among other things, in their answer and cross-petition, that —

"The pretended mortgage set up in plaintiff's petition was never signed or executed by the defendant, Nannie E. Stoner,

but that her name was falsely and fraudulently forged to said instrument by her husband, Samuel A. Stoner; that said pretended mortgage was not made or executed, and that said conveyance was not made by and with the joint consent of Samuel A. Stoner and Nannie E. Stoner, husband and wife; that the acknowledgment of said mortgage is false, fraudulent, and untrue."

*McCrie*, in his reply to this answer and cross-petition, averred that —

"In addition to the acknowledgment set up in his petition, the defendant, Nannie E. Stoner, being fully advised in the premises, did, on the 27th day of December, 1881, execute the writing and acknowledge the same as set forth in a copy hereto attached and made a part hereof, marked 'Exhibit A,' and thereby fully confirming her former acknowledgment and the acts and doings of her husband, Samuel A. Stoner."

"Exhibit A" is as follows:

"STATE OF KANSAS, COUNTY OF ATCHISON, ss.: I, Nannie E. Stoner, wife of Samuel A. Stoner, of Atchison county, Kansas, hereby acknowledge as my act and deed the giving and signing and joining with my husband, Samuel A. Stoner, in the giving and signing of a certain mortgage, dated November 12, 1881, and acknowledged and signed before Chas. F. Goodrich, notary public in and for Atchison county, Kansas, for the sum of five hundred dollars, on lots Nos. 1, 2, 3, 4, 5, and 6, of block No. 1, in Lancaster, Atchison county, Kansas; and hereby agree to and ratify all matters and things done for me and in my name by my said husband, Samuel A. Stoner, in the giving and making of said above-described mortgage deed.

"Dated at Lancaster, Atchison county, Kansas, this 27th day of December, 1881.

[Seal.]            NANNIE E. STONER."

"Acknowledged and subscribed before me, on the day and date last above written.       THOMAS B. McGEE,

[Seal.]                   *Notary Public.*"

Trial by the court at the February term, 1885, a jury being waived. The record does not contain the evidence, but the conclusions of fact and of law are as follows:

"CONCLUSIONS OF FACT.

"1. On or about November 12, 1881, the plaintiff loaned to the defendant, Samuel A. Stoner, the sum of $500, upon

the note, a copy of which is set forth in the plaintiff's peti-
tion, and the mortgage, a copy of which is attached to said
petition as 'Exhibit A.' Samuel A. Stoner made the arrange-
ment with the plaintiff in Atchison, where the plaintiff resides,
and the said Samuel A. Stoner was to have the note and mort-
gage executed by himself and wife, and was then to obtain
the money. Said Samuel A. Stoner and Nannie E. Stoner
were husband and wife, and they with their children resided
upon and occupied the premises described in said mortgage as
their homestead, the same consisting of less than one acre, in
the town of Lancaster, in Atchison county, Kansas.

" 2. Said Nannie E. Stoner did not execute said note, nor
said mortgage, but her name was signed to each of them,
probably by her said husband. Said Samuel A. Stoner brought
said mortgage to C. F. Goodrich, a notary public in the city
of Atchison, and requested him to certify to the acknowledg-
ment of the same by himself and his wife, but said C. F.
Goodrich refused to do so. The next morning said Samuel
A. Stoner came again to said C. F. Goodrich and presented
to him a letter purporting to be written by said Nannie E.
Stoner, and stating that she had signed the mortgage, and that
it was her act and deed, and requesting him to certify to its
acknowledgment. Said C. F. Goodrich, as such notary public,
then made out and executed the certificate of acknowledgment
which forms a part of said 'Exhibit A'; but said Nannie E.
Stoner never in fact appeared before said C. F. Goodrich,
notary public, as stated in said certificate of acknowledgment,
she being at Lancaster, ten miles distant from Atchison, when
said official act was done.

" 3. Said Samuel A. Stoner then took the note and mort-
gage to the plaintiff and delivered the same to him and re-
ceived from him the money as stated in conclusion of fact 1.
The plaintiff did not know the signature of said Nannie
E. Stoner, and supposed that the note and mortgage had been
duly executed by her, and that she had duly acknowledged
the mortgage before said C. F. Goodrich, notary public; and
in making the loan and in taking the note and mortgage, he
acted in entire good faith and without suspicion of bad faith
on the part of said Samuel A. Stoner, or of any wrongful or
criminal act on the part of said C. F. Goodrich, notary public.
Said mortgage was duly recorded on November 21, 1881.

" 4. Said C. F. Goodrich afterward heard that said Nannie
E. Stoner had never signed the mortgage, and being uneasy
about his position in the premises, he got Thomas B. McGee,

another notary public residing in the city of Atchison, to go with him to Lancaster to see her about it, on December 27, 1881. Said Samuel A. Stoner was not at home, and they found her at home alone. Said Thomas B. McGee explained to her the nature of their business, and told her that she had a right to do as she pleased, but that if her husband had forged her name he was liable to get into trouble. She expressed her willingness to ratify what had been done, and she signed and executed the instrument, a copy of which is attached to the plaintiff's reply as 'Exhibit A.'

"5. Soon afterward, said Samuel A. Stoner left this state, but his wife and children remained on said premises, he coming to visit them occasionally, until sometime in 1883, when said Nannie E. Stoner and her children also left the state, and ever since said time the premises have been abandoned as a homestead. Said promissory note has not been paid, nor any part thereof, except as follows: About April 1, 1884, after the abandonment of said premises as a homestead, said Samuel A. Stoner turned over the possession thereof to the plaintiff, upon the understanding that the plaintiff was to collect the rents thereof and apply the same on taxes and necessary repairs, and apply the balance as a credit on said indebtedness. The plaintiff has collected $80, and has paid out $40.70 for taxes and repairs, leaving a balance of $39.30 to be credited on said promissory note; and there is due the plaintiff for rent the further sum of $25 uncollected, which, when collected, together with rent accruing and collected hereafter, shall also be applied upon said indebtedness.

"6. The defendants, G. C. Hixon & Co., furnished to said Samuel A. Stoner certain lumber to be used, and which was used, in making improvements on said homestead premises, and on February 16, 1882, they recovered a judgment therefor against said Samuel A. Stoner before R. B. Drury, a justice of the peace of the city of Atchison, in Atchison county, Kansas, for the sum of $74.76 debt, and $7.10 costs. A transcript of said judgment was duly filed in the office of the clerk of the court, on March 16, 1882, and the same was duly entered so as to become a judgment of this court from said time. On July 22, 1882, an execution was duly issued upon said judgment by the clerk of this court. The same was levied upon said premises, which were advertised by the sheriff for sale, but afterward, on September 21, 1882, said execution was returned by the sheriff unsatisfied, by direction of the attorney of said G. C. Hixon & Co. Costs upon said

execution, $17.30. No part of said judgment has ever been paid or satisfied.

"7. On July 6, 1882, Howell, Jewett & Co. obtained a judgment against said Samuel A. Stoner in this court for the sum of $499.52, to bear interest at 10 per cent. per annum, on a promissory note, given for lumber to be used, and which was used, in making improvements on said homestead premises. Said judgment has not been paid nor satisfied, nor any part thereof."

"CONCLUSIONS OF LAW.

"1. The plaintiff is entitled to a judgment against said Samuel A. Stoner for the sum of $500, together with interest thereon at the rate of 11 per cent. per annum from and after November 12, 1881, less the sum of $39.30 to be applied as a credit of this date.

"2. The plaintiff is·not entitled to any personal judgment against the defendant, Nannie E. Stoner.

"3. The mortgage, as ratified, is valid as to said Samuel A. Stoner and Nannie E. Stoner, and said indebtedness is a lien upon said lots 1, 2, 3, 4, 5, and 6, in block 1, in Lancaster, Atchison county, Kansas, prior to the claim of G. C. Hixon & Co., and Howell, Jewett & Co.

"4. Said G. C. Hixon & Co. have a valid lien upon said premises for the sum of $81.86, with interest thereon at 7 per cent. per annum from February 16, 1882, which is subsequent to the lien of the plaintiff and prior to the lien of said Howell, Jewett & Co.

"5. Said Howell, Jewett & Co. have a valid lien upon said premises for the sum of $499.52, with interest thereon at the rate of 10 per cent. per annum from July 6, 1882, which lien is subsequent to the lien of the plaintiff and subsequent to the lien of said G. C. Hixon & Co.

"6. Said premises should be sold by the sheriff, without appraisement, and after the payment of costs of this suit and the charges for such sale, the balance should be applied to the payment of said claim and liens in accordance with the priorities hereinbefore stated."

New trial denied, and judgment in accordance with the foregoing findings. It was also decreed that, after the payment of the costs of this action and the charges for the sheriff's sale of the mortgaged real property, the residue of the pro-

ceeds of such sale be applied in payment of the said judgment liens, in priority as follows:

"1. The judgment and costs herein in favor of plaintiff, Robert McCrie, and against said Samuel A. Stoner.

"2. The judgment and costs herein named as a second lien upon said premises, in favor of G. C. Hixon & Co.

"3. The judgment and costs herein named as a third lien upon said premises, in favor of Howell, Jewett & Co.; and that the purchaser of said premises at such sale take the same free and clear of the liens herein named, and that thereafter said defendants be barred from setting up any interest in, title to, or lien upon, said described real estate."

*Howell, Jewett & Co.* bring the case here.

*Smith & Solomon,* for plaintiffs in error.

*T. M. Pierce,* for defendant in error.

Opinion by SIMPSON, C.: The precise question in the case is, whether the written instrument executed and acknowledged by Nannie E. Stoner, on the 27th day of December, 1881, considered in connection with the mortgage executed by her husband, Samuel A. Stoner, on the 12th day of November, 1881, fulfills the requirements of article 15, § 9 of the constitution, and amounts to and is the joint consent of husband and wife to the alienation. In this case the husband, without the knowledge or consent of the wife, executed a mortgage on the homestead, signed, or procured some one to sign, the name of the wife to the instrument creating the lien, and then fraudulently procured its acknowledgment by a notary public. Subsequently the notary, learning the facts and becoming uneasy for his own safety, sought the wife at a time when the husband was not present, and, "explaining to her the nature of his business," she by a written instrument attempted to ratify what her husband had done. Is this *consent?* Is it the *joint consent* of husband and wife as contemplated by the constitution?

The homestead feature of the laws has always been regarded with peculiar favor by the courts of those states by which it

has been enacted. It has been the theme of both forensic and judicial eloquence. It has been repeatedly declared in legislative halls and from the bench, that the policy of these laws is "liberal" and "benevolent," "their object a noble one"; that "they are an enlightened public policy," and "their provisions the most beneficent." In the convention that framed the constitution of this state there was no one subject that was more carefully considered and more thoroughly discussed than the homestead provision. At least twenty-five pages of the published debates of that body are devoted to the discussion of this subject. In the various stages and phases of that discussion, among the many opinions and comments made on the section, as it was being perfected, and as finally adopted, the following expressions are selected as guides to the intention of its authors, to wit:

"The wife's right to the actual control of the homestead."

"The guarantee of a home to every member of the family."

"A reckless or drunken husband should not have power to alienate the home of his family."

"The protection of the family, and not the head of the family merely."

"To give permanency and value to the homestead by making its alienation difficult."

"To put it out of the power of the husband or the misfortunes of trade to take away the homestead."

"A home for the family, that Shylocks cannot reach."

"The woman, the wife and mother, shall have control of the home."

"There is no intention to exclude the woman, for that would destroy the object of a homestead."

"Neither the hand of the law nor all the uncertainties of life can eject the family from the possession of it."

"Gives every mother and child in the state a home to which they may retire and find shelter from the storms of life."

This is the spirit in which the homestead provision was conceived, and these are the reasons for its adoption, and it must be read in the light, and construed in the spirit, of these declaratory statements of its framers. In the earliest adjudications of this court on questions arising under this homestead

feature of our constitution, the same or similar expressions are used. In *Morris v. Ward*, 5 Kas. 239, Mr. Justice VAL-ENTINE says:

"The homestead was not intended for the play and sport of capricious husbands merely, nor can it be made liable for his weaknesses or misfortunes. It was not established for the benefit of the husband alone, but for the benefit of the family and of society; to protect the family from destitution, and society from the danger of her citizens becoming paupers."

In *Helm v. Helm*, 11 Kas. 19, Chief Justice KINGMAN says:

"The wife's interest is an existing one. The occupation and enjoyment of the estate is secured to her against *any act of* her husband or of creditors without her consent. If her husband abandons her, that use remains to her and the family. With or without her husband, the law has set this property apart as her home."

These citations are sufficient to show that both the convention that framed the constitution and the court whose prerogative it is to construe it, have unitedly declared its purposes and objects to be for "the protection and maintenance of the wife and children against the neglect and improvidence of the husband and father."

This court, in the consideration of questions arising under this provision of the constitution and the statutory enactments in aid thereof and supplemental thereto, must give them a liberal construction, so that the purposes intended by the laws shall the better be advanced and secured. (Thomp. H. & Ex. p. 8, and authorities there cited.) These same considerations induce the courts to adopt a strict rule respecting their alienation, to the end that what is regarded so highly as to be embodied in the organic law as the most beneficent legislation and the most enlightened public policy, is not to be lightly regarded and easily avoided by the parties for whose protection the legislation was adopted. Hence it is held that the homestead right can be barred only by complying strictly with the laws prescribing the mode of alienation. (*Moore v. Titman*, 33 Ill. 360; *Kitchell v. Burgwin*, 21 id. 45; *Connor*

v. *McMurray*, 84 Mass. 202; *Greenough v. Turner*, 77 id. 332; *Hoge v. Hollister*, 2 Tenn. Ch. 606; *Dickinson v. McLane*, 57 N. H. 31.) To divest the homestead estate, the mode of conveyance prescribed by the law governing the alienation of such estates must be strictly pursued, is the rule generally adopted in all the states, in which such laws have been enacted, held more strictly in some than in others, and yet in all there must be a literal compliance with the provisions of the statutes in this behalf.

From all the adjudications upon this subject, the three following rules are deduced, and may fairly be considered as settled:

1. The object of the homestead law is to protect the family of the owner in the possession and enjoyment of the property.

2. That construction must be given such laws, which will best advance and secure their object.

3. To divest the homestead estate, there must be a literal compliance with the mode of alienation prescribed by the statute.

Applying these rules to the mortgage first executed by Stoner, and subsequently to its attempted ratification by Mrs. Stoner, the conclusion is irresistible that it was

1. Homestead— mortgage without joint consent of husband and wife, void.

not done in compliance with the provisions of the homestead law, and that it was violative both of the letter and the spirit of the constitution. The requirements of the organic law in this respect are plain and unmistakable: *"The homestead shall not be alienated without the joint consent of husband and wife, when that relation exists."* The consent of the wife to the execution of this mortgage was not had before, or at the time of the attempted alienation on the 12th day of November. If she ever consented, it was long after its delivery, and at the time of the acknowledgment of the alleged ratification on the 27th of December.

Is this the act of "joint consent" as required? The usual and legal signification of the word consent, implies assent to some proposition submitted. In cases of contract it means

the "concurrence of wills." Consent supposes a physical power to act, a moral power of acting, and a serious, determined and free use of these powers. In the very nature of things, consent to the alienation must precede the act of conveyance. The husband must have made a proposition to the wife, or the wife to the husband, or a purchaser to both, to alienate the homestead, and the mind of the husband and of the wife must have concurred, and they must have jointly consented to the execution of the conveyance, or the creation of the lien, both assenting and both signing the instrument before delivery.

"It might be that a husband and wife, by two separate instruments, could alienate the homestead when it was intended *by both* that such instruments should operate together as a single instrument; for in such a case it might perhaps be said that the separate consent of each had such a connection with each other, that they might together be considered as the joint consent of both." (Valentine, J., in *Ott v. Sprague*, 27 Kas. 620.)

In such a case, where it clearly appears that there had been a previous consultation between husband and wife, and both, with full knowledge of all the facts and circumstances, had consented to the alienation, and where there is an entire absence of fraud, intimidation or concealment of material facts from the wife or the husband, and where, from the temporary absence of either, or, being widely separated, and there being a necessity for prompt action to take advantage of a bargain conducive to the interests of both, under such and similar circumstances, an alienation of the homestead by separate instruments, but each containing a reference to the other, might be upheld; but the safer and better rule to observe, is to have the joint consent of the husband and wife evidenced by their signatures to the same instrument, at the same time and place, before the same officer, and in presence of each other. The word "joint" seems to have been used advisedly and with such a purpose, and to hold otherwise would be to ignore it in the construction of the constitutional provision,

instead of giving to it the force and meaning it is naturally entitled to.

In *Luther v. Drake*, 21 Iowa, 92, on this question the court say:

"The point made by counsel is, that as the husband and wife did not concur in and sign the same conveyance, the homestead title did not pass, and the deed was of no validity under the statute. The question is not free from difficulty. The interests involved therein to property of untold value in the state, are too great to justify its determination until it necessarily arises; as at present advised, this court might not be united in its solution, and as the same can be disposed of upon other grounds, we prefer to leave it open for future consideration."

In *Dickinson v. McLane*, 57 N. H. 31, the case being this:

"March 13, 1862, John Dickinson, the plaintiff's husband, mortgaged the premises to Z. K. Dickinson, releasing all his right to a homestead therein, but the plaintiff did not sign the deed. This mortgage was foreclosed December 16, 1864, and the defendant holds the title. March 28, 1863, the plaintiff by her separate deed, (her husband not joining therein,) quitclaimed to said Z. K. Dickinson, 'all the right of homestead that she might or could be entitled to, in any event, or in any change of life or circumstances,' in said premises."

At this time, John Dickinson and the plaintiff had three minor children.

Smith, J., said:

"There is nothing in the act of 1851 in relation to homesteads, or in any subsequent statutes, that shows any intention of the legislature that a married woman might release her right of homestead by a separate deed. Indeed, the language used implies that a release of homestead, to be valid, must be by the joint deed of the husband and wife. . . . Again, the natural construction of the language of the 6th section, 'unless the wife join in the deed of conveyance,' is that she join in the same deed he executes, and not by her separate deed. But aside from this, there is nothing in the act which shows that the legislature, in providing that the wife might join in the deed of conveyance, by her husband, of the homestead, intended that any different construction should be given

to such provision than what the law, as it had been in force in this state up to that time, would permit her to do. From these views, it follows that the plaintiff never released her homestead in the premises set out in her bill, by any valid deed."

Cushing, C. J.:

"The portion of the statute, which, according to my understanding, is to govern this matter, is as follows: 'And no release or waiver of such exemption shall be valid unless made by deed executed by the husband and wife, with all the formalities required by law for the conveyance of real estate.' (Comp. Stats. 474, §1.) In the very teeth of this statute we are asked to hold that the homestead here has been released by the separate deeds of the husband and wife, executed during the life of the husband. The policy of the law has wisely provided that this most important right, this *tabula e naufragio*, this last plank from the shipwreck, shall not be lost unless the husband and wife lose their hold of it at the same time and by the same act. In some way, it is not material to us to inquire how, the wife has been induced to execute this deed alone; probably because the husband then refused to join in it. And it is proposed that the first time a matter of this kind is brought to the notice of the court, the law should be judicially repealed. Why? I am not able to see any reason for doing so, and I therefore think that the homestead of the plaintiff is not released."

Ladd, J.:

"The separate deed of the husband and the separate deed of the wife, are alike ineffectual to pass the homestead right. By the plain terms of the statute, neither can have any effect upon it. It seems to follow that the separate deeds of both must be equally ineffectual. The statute created a new and somewhat peculiar estate—an inchoate right in which the wife and minor children, as well as the husband, have an interest. It provides the exact mode in which that right may be released or conveyed. . . . It was doubtless thought necessary to guard thus carefully the mode of conveying away the right, in order to secure fully the beneficial purposes of the act. I do not think it is within the power of the court to hold that any mode of conveyance, different from that required by the act, is effectual, either by way of estoppel or otherwise. Our cases, where it has been held that a release by the wife of her right of dower, by a separate deed executed subse-

quently to the deed of her husband, cannot govern this case, because of the clear and unequivocal terms of the statute prescribing the only way in which the homestead right can be conveyed."

In the case of *Poole v. Gerrard*, 6 Cal. 71, the case being this: Hiram Poole, the husband of the plaintiff, on the 15th of September, 1853, conveyed the homestead to the defendant for $3,500, by a deed in which his wife did not join, though it was made with her knowledge. Poole the next day left the country. The plaintiff wife, who was residing on the property under the impression that she had no legal rights to the homestead, conveyed her claim thereto to the defendant for $200, by a deed executed and acknowledged as if she were a *feme sole*, on the 28th day of September, 1853. She subsequently brought this action to recover possession of the homestead, and for rents, etc.

Heydenfelt, J.:

"The court below erred in deciding that the deed of the plaintiff (the wife) conveyed all her interest in the property. To make a valid sale of the homestead requires the *joint* deed of husband and wife. The husband must make the contract and the wife must assent to it, by an examination separate and apart from her husband. This is the mode pointed out by the statute, and it must be strictly pursued."

The case of *Sprague v. Ott*, decided by this court and heretofore cited, was one in which the husband and wife had made separate conveyances of their homestead, but there was an interval of eight years between the execution of the deed of the husband and that of the wife, during all of which time the wife had been separated from the husband, and for the most of that time both had been absent from the homestead. It was held by the court, Mr. Justice VALENTINE delivering the opinion, that—

"Where two separate and distinct instruments are executed, at two separate and distinct times, as in this case; where a long interval elapses after one is executed, before the other is executed, the interval in this case being over eight years; and where the two instruments are executed without any reference

to each other, or without any intention that the two together may be considered as one single and united instrument, we think that one cannot make the other valid."

In *Morris v. Ward*, 5 Kas. 239, it is held that a mortgage of the homestead executed by the husband alone is void.

In *Dollman v. Harris*, 5 Kas. 597, it is held that a mortgage of a homestead, executed by the wife alone, is void, notwithstanding the legal title to the same may be in her and not in her husband. How then can it be said that two void instruments, one executed by the husband and the other by the wife, mortgaging the homestead, can have the effect to create a lien? They are void for all purposes, whether considered separately or taken together.

Counsel for defendant in error refers to the case of *Spafford v. Warren*, 47 Iowa, 47, and claims that case as decisive of this. We do not think so. In that case the wife, having previously been consulted, consented to the execution of the mortgage, and she and her husband, in presence of each other, signed and at the same time acknowledged the instrument. The name of the grantee and the description of the property were left blank, and the writing was left in the possession of the husband, to be used in accordance with the understanding between the husband and wife, to secure a creditor of the husband. The wife left home upon a visit, and during her absence the husband discovered that the blank instrument executed by her and himself was a deed absolute. He filled the proper blank with the description of the property which he and his wife intended to incumber by the mortgage. A short time thereafter, having bargained a sale of the homestead to defendant Warren, he filled the other blank in the instrument executed as aforesaid by the plaintiff, with the name of the purchaser Warren. On the return of the wife, her husband informed her of the uses to which the instrument executed by them had been put, and of the sale and conveyance of the homestead by means of that instrument. With this knowledge she consulted lawyers, who advised her that her rights in the property had not been divested by the conveyance. With this

knowledge and advice, she and her husband occupied the house until the March following the conveyance; and while so occupying, it was offered for sale by the purchaser, and Warren took one person with whom he was negotiating with that view, to see it. They were met by the wife, who knew the object of the visit, and she made no claim to the property. Shortly after this, the husband and wife removed from the property and a tenant of Warren went into the possession thereof. More than three years after Warren purchased the property, and nearly three years after plaintiff removed from it, she commenced an action in chancery to set aside the conveyance. In the meantime, Warren had paid off the mortgage resting upon the property at the time of its purchase from her and her husband, had discharged a debt of the husband's which he had assumed to pay as a part consideration for the purchase, had made certain improvements upon the house, and had executed a mortgage on the property to one Stevens. The court held on this state of facts, that "the law raises a presumption that she has assented to the validity of her deed, and thus cured its infirmities by ratification." This case may have been properly decided on the ground that the wife, with the full knowledge of her rights as advised by counsel, and of the action of her husband as communicated by him, voluntarily surrendered her property, made no objection to the defendant's title when he offered to sell it in her presence, permitted him quietly to hold possession of it for more than three years before she commenced her action, and knew that he was making improvements and discharging indebtedness resting on it. All these facts may have been sufficient to estop her from claiming an interest in it. She kept silent when she ought to have spoken. I do not understand that these acts of hers, or rather absence of protest, complaint, or action, ratify her conveyance; I can understand how by these things she can be estopped from setting up or claiming any interest in the property. The learned judge who delivered the opinion used estoppel and ratification interchangeably, and as if they are synonymous and of the same legal signification. I do not

so regard them. Applying the most approved definition of estoppel, (that of Bigelow,) to the facts in the Iowa case, and the result would be that her acts were such in respect to the property, that it would be a fraud on the purchaser to permit her to impair or controvert them. The character of estoppel is given to what would otherwise be a mere matter of evidence. Estoppel may be created by silence or non-action, while ratification requires some positive, assertive act; and it does not make any difference whether the ratification is express or implied, for if implied, it is from the acts of the individual respecting the subject-matter of the controversy.

The case at bar is one in which the contention of the counsel for the defendant in error is, that the wife ratified the execution of the mortgage in her name by the husband. The case of *Spafford v. Warren* is one in which the wife placed herself in such a position by her non-action as to be estopped. In this case there is not a single element of the doctrine of estoppel to be found. It may be that in view of the decision of the supreme court of Iowa in the case of *Stinson v. Richardson*, 44 Iowa, 373, it was necessary for the court in *Spafford v. Warren* to deal liberally with the doctrine of ratification. In the first case it says:

"It is contended that the plaintiff [the wife] assented to and even advised the sale, and that she is now estopped from setting up her homestead rights in the property, if she ever had any. But if we should hold that she relinquished her homestead rights by verbally consenting to the assignment, or estopped herself by such consent, we should nullify an express provision of the statute. *Whether she knew it was a nullity or not, there was nothing she could do or say about it,* short of concurring in and signing the same joint instrument with her husband, that could give it any validity."

It would seem that this comes very close to saying that a married woman could not be estopped by anything she could say or do, (except joining in the conveyance,) from claiming her interest in the homestead.

In this state, the question of estoppel is an open one in this class of cases. In the case of *Helm v. Helm*, supra, Chief

Justice KINGMAN, in commenting on the facts of that case, says:

" It may well be questioned whether an innocent purchaser would not hold the land against her who had stood silent while he purchased for a full consideration the land which the record showed belonged to William Helm."

No opinion is expressed now with reference to it, there being no facts in this case that invoke it; we will meet it when it comes.

There is another reason why this attempted ratification is not effectual to make it so:

"It must be shown that there was previous knowledge on the part of the principal of all the material facts and circumstances attending the act to be ratified, and if the principal assent to the act while ignorant of the facts attending it, he may disaffirm it when informed of such facts.   Indeed, in the very nature of things this must be true.   The effect of ratification is to create a contract; but a contract implies assent, and how can there be assent without knowledge?" (*National Bank v. Drake*, 29 Kas. 311.)

There is no finding or conclusion of fact that the wife was made acquainted with all the material facts attending the execution of the mortgage by her husband.   The court below in the fourth conclusion of facts says that the notary who took the acknowledgment of the mortgage, being uneasy about his position in the premises, procured another notary to accompany him to Lancaster to see her about it, on the 27th of December.   Samuel A. Stoner was not at home, and they found the wife at home alone.   The other notary explained to her "*the nature of their business*," and told her that she had a right to do as she pleased, *but that if her husband had forged her name he was liable to get into trouble.*   She expressed her willingness to ratify what had been done, and she signed and executed the instrument.   This does not make the showing of knowledge required by law.   A notary who had deliberately violated a criminal statute of the state went to the wife, whose name had been forged to a mortgage by her husband and her acknowledgment certified to by this notary, and ex-

plained to her the nature of his business, told her it is true that she could do as she pleased, but coupled it with a statement that if her husband had forged her name he was liable to get into trouble. The nature of the notary's business was to save himself from trouble. He was not a party to the contract; he did not know all the circumstances attending it; he did not visit the wife in good faith to impart knowledge of all the material facts and circumstances of the transaction; he was there to shield himself from the consequences of a criminal act, and not as a party to the contract. To hold such a ratification effectual would put it in the power of every reckless and improvident husband in the state to render nugatory a plain constitutional provision. Such a husband could sign his wife's name to a mortgage of the homestead and have it certified as acknowledged, and probably in every instance the wife would ratify rather than see her husband suffer. "To constitute a ratification, it must be voluntary, deliberate and intelligent; and the party must know that without, he would not be bound."

The conclusions of fact respecting the execution of this ratifying instrument by Mrs. Stoner do not authorize the conclusion of law that the mortgage as ratified is valid. We will not stop to discuss the question as to whether the act of Stoner in signing the name of his wife to the mortgage, or procuring some other person to do so, is a void or a voidable act, and if void not subject to ratification. While the writer of this opinion has a very decided conviction on the question, its solution is not absolutely necessary to the disposition of the case in this court. There is, however, another most important and serious reason why this attempted ratification is not effectual. A criminal act is not capable of ratification.

2. Criminal acts, incapable of ratification. It is a conclusion of fact in this case, that Nannie E. Stoner never signed the note and mortgage, and that her name was probably signed to them by her husband. Whoever did sign her name was probably guilty of a violation of the first subdivision of §114 of the act regulating crimes and punishments, (Comp. Laws of 1885, ch. 31,

§114,) and rendered himself liable to be charged with the crime of forgery in the first degre. The notary, C. F. Goodrich, certified the acknowledgment of the execution of the mortgage by Mrs. Stoner, when in truth no such acknowledgment was made, and this was in violation of the first subdivision of §119 of said act, (Comp. Laws of 1885, ch. 31, §119,) and he rendered himself liable to be charged with the crime of forgery in the second degree. We will not temporize or refine with this question. It may be said that the wife should be permitted to ratify the mortgage so far as the innocent mortgagee is concerned, he having no knowledge of the fraud; but the answer to this is, that both the signatures to and the certificate of the execution and acknowledgment of the mortgage are criminal acts, and cannot be ratified for any purposes. It is always the case that some innocent persons suffer by reason of the commission of a criminal act, for no good results can flow from it, nor any rights be acquired by it or in consequence of it. We cannot conceive of any state of facts or any chain of circumstances, except it possibly be by estoppel, whereby any person can acquire any interest, estate or lien upon real estate by an instrument to which signatures are forged, and a false certificate of acknowledgment is attached.

This question has been considered by the courts of other states; and probably the most thoroughly considered case is that of *Workman v. Wright*, 33 Ohio St. 405, the best report of which is found in 31 American Reports, 546, and foot-note in which all the authorities *pro* and *con* are cited. We rest our views upon these two propositions: one is that, there having been no pretended authority for the execution of the mortgage in the name of the wife by the husband, the doctrine of ratification does not apply; the other is that the written instrument executed by Mrs. Stoner on the 27th day of December, was really a promise given for the purpose, and in consideration of avoiding a prosecution, and was therefore void as against public policy.

The mortgage of the defendant in error, being void, any

3. Mortgage—questioning its validity. party to the suit can take advantage of it, and hence the plaintiffs in error, whose lien by the judgment of the court below was subordinated to that of the mortgage, can properly raise the question of its validity.

"In an action to foreclose a senior mortgage·executed by the husband, on answer by a junior mortgagee, alleging that the mortgaged property was the homestead of the mortgagor when the senior mortgage was executed, and that the wife did not join in its execution, constitutes a good defense to the action, even when the mortgagor makes no defense." (*Alley v. Bay*, 9 Iowa, 509; *Dye v. Mann*, 10 Mich. 291.)

It is recommended that this cause be remanded to the district court, with instructions to so modify its judgment as to declare the mortgage of the defendant in error void, and that it is not a lien on the premises.

By the Court: It is so ordered.

All the Justices concurring.