## LONG v. TALLEY et al.

No. 10258—Opinion Filed Oct. 18, 1921.

Rehearing Denied Nov. 22, 1921.

(Syllabus.)

**1. Homestead — Abandonment — Effect of Renting.**

Any temporary renting of the homestead shall not change the character of the same when no other homestead has been acquired.

**2. Same—Removal to Another State—Effect on Wife's Homestead Rights.**

The wife may consent to renting the homestead and voluntarily accompany her husband to another state without losing her rights in the homestead so that the husband can sell it without her consent.

**3. Same—Abandonment—Intent.**

When property has once been impressed with the homestead character, the title to which is in the husband, it must be made clearly to appear that the wife voluntarily intended to relinquish and did abandon the homestead and that another homestead has been acquired before the husband can convey it without her consent given as required by law.

**4. Same—Contract of Husband Alone to Sell—Validity—Evidence—Judgment.**

The evidence examined, and held, that it supports the findings and judgment of the trial court.

**5. Same—Action by Wife to Cancel Contract.**

Under the Constitution and laws of Oklahoma a contract for the sale of the homestead, to be valid, must be in writing and subscribed by both husband and wife where that relation exists. Such contract being subscribed by the husband only is void and should be canceled by a court having jurisdiction thereof in an action instituted by the wife for that purpose.

Error from District Court, Tulsa County; N. E. McNeill, Judge.

Action by Pearl Talley against Elton S. Long and another to cancel contract for sale of homestead and for other relief. Judgment for the plaintiff. Defendant Elton S. Long appeals. Affirmed.

Shell S. Bassett, for plaintiff in error.

T. L. Brown and Kirkpatrick & Brown, for defendant in error.

MILLER, J. This action was commenced in the district court of Tulsa county by Pearl Talley, as plaintiff, against Haskell B. Talley and Elton S. Long, as defendants. The action was to require her husband, defendant Talley, to pay alimony for the support of the plaintiff and her children under section 4975, Revised Laws of Oklahoma, 1910, and to subject certain real estate in the city of Tulsa to her use and control. She also asked the court to cancel a purported contract made by her husband, Haskell B. Talley, whereby he had agreed to sell to defendant Long the real estate above referred to. She alleged that said property was the homestead of the plaintiff and defendant Haskell B. Talley at the time of making the contract; that plaintiff had not joined in the execution of the contract and had not consented thereto, therefore the contract was void. Defendant Long filed an answer and contested the cancellation of the contract. Defendant Haskell B. Talley made no appearance in his own behalf, but his deposition was taken in behalf of his codefendant Long and introduced on the trial of the case. The case was tried to the court without a jury, which resulted in findings of fact by the court that the property in controversy was the homestead and inalienable, except by the joint consent of the husband and wife. Judgment was rendered canceling the contract and granting other relief to the plaintiff as prayed for. Defendant Long filed a motion for a new trial, which was overruled; he appealed and appears here as plaintiff in error. For convenience, the parties will be referred to as they appeared in the lower court.

At the commencement of the trial of this case it was agreed in open court by counsel for plaintiff and counsel for defendant Long that the only issue before the court affecting the rights and claims of defendant Long was whether or not this property was the homestead of the plaintiff and so impressed with the homestead that is could not be conveyed without the wife joining in the deed. Defendant Long contends that, though it may, at one time, have been homestead property, it was not homestead property at the time Mr. Talley sold it and contracted to convey it to Mr. Long, and that contract having been made in good faith, the legal title having been vested in Mr. Talley, his wife cannot subject the property to any claim of hers.

Defendant Long in his brief refers to his assignments of error as follows:

"Aside from the formal assignments of error set out in the petition in error, as to the overruling of motion for new trial, and that the court erred in rendering judgment in the case, plaintiff in error assigns as error the following:

"1. That the trial court erred in holding that the contract entered into between the defendant Talley and the de-defendant Long was not a binding and valid contract, and erred in setting aside and canceling the same.

"2. That the trial court erred in holding that the property involved in said contract was the homestead of the defendant Haskell B. Talley and the plaintiff, Pearl Talley, and could not be disposed of by Haskell B. Talley on the date of his contract with Long, to wit; June 6, 1917, without the consent of his wife and without her joining in the conveyance.

"3. That the trial court erred in holding that the plaintiff below had never changed her residence from the city of Tulsa and state of Oklahoma and that for this reason she had a homestead right in the property covered by the contract between Talley and Long, and that for this reason the defendant could not on June 6, 1917, dispose of said property without the plaintiff joining in the conveyance.

"4. That the decision of the court below was not sustained by sufficient evidence.

"5. That the decision of the court below was contrary to law."

At the outset of his argument defendant Long lays down this proposition:

"For the purpose of this brief, all the assignments of error may be embodied in one propsition, as in our judgment the correctness of the decision of the trial court rests upon whether or not the court correctly answered this question: Did Pearl Talley, the plaintiff below, on June 6, 1917, have such an interest in the property covered by the contract between her husband and the plaintiff in error as would prevent her husband from disposing of that property without her consent or without her joining in the conveyance? Or, to state the question more simply, was the property which was the subject-matter of the contract of June 6, 1917. the homestead of the Talley family on that date?

"The court answered this question in the affirmative and it is our contention that the answer was incorrect; that it was contrary to and against the weight of the evidence and the undisputed facts in the record and a misapplication of the law to these facts."

Under this statement the only questions presented to this court are: Is the finding of facts of the trial court clearly against the weight of the evidence? Did the court commit error in applying the law to the facts? We will first consider the question of fact as presented by the evidence.

The following facts are indisputably established by the evidence: The plaintiff and defendant Haskell B. Talley were legally married on June 12, 1909, and have ever since been and up to the time of the trial of this case in the lower court were husband and wife. Four children were born as a result of this marriage, to wit: Hershell Talley, aged eight years; Esther Talley, aged six years; Rebecca Talley, aged four years, and Charles Emanuel Talley, aged two years. Haskell B. Talley, the father, and Pearl Talley, the mother, with these children, constituted the family. They established their residence and home at 724 North Denver street, in the city of Tulsa, Tulsa county, Oklahoma, on the property in controversy in this action, which is described as lot one (1), block five (5), Brady Heights addition to the city of Tulsa. They occupied these premises as their homestead from a short time after their marriage until in May, 1916, when defendant Haskell B. Talley went to his mother's home at Florence, Tenn.

Haskell B. Talley testified by deposition, in substance, as follows: On May 10, 1916, he shipped a part of their household goods to his mother, Katie Talley, in Tennessee, and immediately after that he went to his mother's home in Tennessee. He had rented the house which had formerly been their homestead, and the plaintiff came to Tennessee in July, 1916. She remained there until March, 1917. Haskell B. Talley's health was very much impaired and he was trying to make arrangements to enter an officers' training camp. He went to Tulsa in the early part of March, 1917. He was then asked these questions:

"Q. How long did you remain in Tulsa on this visit? A. I left Tulsa on the night of April 10, 1917, going to a farm I am interested in near Depew, Okla. On the morning of the 11th of April I began a journey on horseback and afoot for home, reaching home on the night of April 30. 1917. Q. What was your purpose in taking this trip? A. My principal reason was to build up my health so that I could stand a physical examination for admission into the army. I also wished to bring a thoroughbred mare which I had on the farm near Depew home, and to observe the 1917 cotton acreage."

He also testified that about February 1, 1916, he went to Tennessee with the intention of relinquishing his residence in Oklahoma and of acquiring a new domicile in Tennessee, and that he did not at any time prior to the filing of this suit intend to re-establish his residence in Oklahoma.

Mrs. Katie Talley, the mother of Haskell B. Talley, testified by deposition that she lived near Florence, Tenn., and that Pearl Talley came to her house in the first part of the summer of 1916, and stayed until the latter part of March, 1917. That her son, Haskell B. Talley, was there until March 3, 1917, when he returned to Tulsa. Her deposition then shows the following questions and answers:

"Q. What occurred when he left about March 3rd, 1917, to go to Tulsa? What did he say to his wife, and what was his conduct? A. She cried bitterly after he left and said she reckoned if he was killed his mother and her mother would take care of her and her children. Q. State whether or not she expected him to go from Tulsa to a training camp, and whether or not his wife understood he was going to do anything of that sort. A. Yes, it was understood he was going to a training camp. Q. Had he been to a training camp the summer before? A. Yes. Q. What was the state of your son's health a year before that time when he returned to your house from Tulsa? A. He was in poor health. Q. While your son was at your house, state whether or not Mrs. Pearl Talley was well provided for or not by you and your son, Haskell Talley. A. I live on a large farm, and did at that time, and Mrs. Pearl Talley had all that she needed to live on, and so did her children. Q. Did you at any time make a deed to your grandchildren to give them the home place? State whether or not you expected Mrs. Pearl Talley to live on that place when you made that deed, after your death. A. Yes, I did; made the deed, and expected my son and his children to live on my home place, where my family had lived for several generations."

Defendant Elton S. Long testified to having purchased the property in controversy from defendant Talley, and then testified as follows:

"Q. Mr Long, I will ask you what was done towards the carrying out of this contract, if you know? A. In what way? I don't understand you. Q. The contract provides for the payment of $1,750.00 in cash upon the consummation of the sale, and the balance of the purchase price to be paid in notes of $1,000.00 bearing interest at the rate of eight per cent. per annum, all the instruments and the sum of money of $1,750.00 to be placed in escrow in the National Bank of Commerce with this contract? A. Yes, sir. Q. —Until Mr. Talley could furnish you good title to this property? A. Yes, sir. Q. That was done, was it? A. Yes, sir, and is there at the present time. Q. I will ask you, Mr. Long, if you made this purchase of this property in good faith? A. Yes, sir. Q. And you expected and still expect Capt. Talley to furnish you good title to the property? A. Yes, sir. Mr. Bassett: That is all.

"Cross-examination by Mr. Biddison.

"Q. The good title you refer to is the fact of getting his wife's signature to the deed? A. A man would not want to buy a piece of property unless he could get a clear title to it. Q. That is the objections you had to the title, because his wife wouldn't sign the deed? A. I wouldn't want to buy property unless it had a good title, and it would not be a good title unless his wife's signature was on the deed. Q. That was your objection to this, and the reason you put this money up was because his wife would not sign the deed or didn't sign the contract? A. Well—Q. Was it? A. Why, I wouldn't want to pay out money either—Q. Well, now, just answer the question; is that the reason the money was put up? A. Yes, that there wasn't a clear title and we were waiting for the title. Q. Did you pay Mr. Talley any money? A. No, sir; the money that was put up is in escrow. Q. Mr. Long, did you employ the counsel that appeared to take these depositions in Tennessee? A. No, sir. Q. Did you pay for the taking of those depositions? A. No, sir. Q. Did you employ the counsel who are appearing here to represent you? A. No, sir."

The plaintiff, Mrs. Pearl Talley, testified as follows:

"Q. Where did you live after you were married? I mean in what state? A. Oklahoma. Q. Living in Tulsa? A. Yes. Q. Have you ever lived anywhere else except in Tulsa during all these years? A. No, sir. Q. This has always been your home? A. Yes, sir. Q. Where has your home been since you have been married? A. In Tulsa, Okla. Q. How much of the time since your marriage up to the present time have you resided in Tulsa, Oklahoma? How much of that time have you lived here as your home? A. With the exception of taking little trips I have always lived here since I have been married. Q. Do you know the lot and block number? A. No. Q. You verified this petition as being lot No. 1, block 5; do you know whether that is true or not? A. Yes. Q. Brady Heights addition? A. Yes, sir. * * * Q. Spend the summer; did you ever go to Tennessee for the purpose of making that your home? A. No, sir. Q. Did you ever have any other home? A. No, sir. Q. —Since you have been married other than the lot one, block five, Brady Heights addition? A. No,

sir. * * * Q. Were you ever called down to Nixon, Bassett & Nixon's office for the purpose of signing a deed? A. Yes, sir. Q. Under what conditions were you sent for? A. He came up to the house and made threats. Q. Who came up? A. Mr. Talley. * * * Q. Made threats he would kill your mother and Mr. Kistler and ought to finish you? A. Yes. Q. What did you tell him? A. I told him if he felt that way about it and wanted the home I would go up and sign the deed to keep him from killing anybody. Q. Did you go up and sign a deed? A. Yes, sir; he waited for me to get ready. * * * Q. You did not sign the deed, did you? A. No, sir. Q. Have you ever signed a deed to it? A. No, sir. Q. Where were you living while you were back in Tennessee? A. His mother's home. Q. Did he ever prepare any place out there for you to live? A. No, sir; only his mother's home. * * * Q. Where were you when he took the furniture and sold part of it and shipped the rest of it to Tennessee? A. I was living with my mother. * * * Q. He told you at the time that the furniture was shipped that he was going to Tennessee to make his home, didn't he? A. No, sir; I didn't know that he shipped the furniture away. Q. That was about the time that he sold the furniture, that is, a part of the furniture, and shipped the rest of it? A. I asked him what he was going to do with the furniture, and he told me I could have it and send for it. I knew that was my home: why did I want to take the furniture out? So in the meantime he hurriedly packed the furniture and shipped it before I knew anything about it. Q. Then told you about it after he had shipped it? A. Yes, sir. * * * Q. Didn't he ask you to come and go with him to Tennessee and make your home there at that time? A. He said something about wanting to sell the home, and I refused. Q. I understand, but didn't he ask you to come and go with him to Tennessee to make his home? A. I wanted to go see the children, but I didn't agree to make my home. * * * Q. Now, when you left here in July, what did you take with you to Tennessee, anything? A. My trunk. * * * Q. I will ask you if it isn't true that this was the arrangement: Talley was going to build a home right across the pike from his mother's on his mother's land and you and he were going to live there and Talley was going to open up a law office in Murphreesboro and practice law and go in and out morning and evening in his car? A. No, sir; I never heard of that before."

After testifying she had returned to Tulsa, in March, 1917, from her visit to Tennessee, to make her home in Tulsa, she testified as follows:

"Q. And you had come off without bringing the clothing for the children and Talley had to go down and buy some clothing for the little boy Hershell? A. I didn't leave any-thing there. Q. What was the answer to that question, Mrs. Talley? A. I say I didn't leave the children's clothing there. Q. Didn't leave any clothing there? A. I left some discarded clothes. Q. I will ask you if it isn't a fact that while Mr. Talley was in Tennessee and while you were there with him, between July, 1916, and March 25, 1917, if it wasn't finally agreed between you and Mr. Talley that he was to go to war to Fort Oglethorpe and join the army and that you were to make your home with his mother and sister and father on the farm there until he could come back, wasn't that the arrangement between you and him? A. No, sir. * * * Q. Mrs. Talley, did you ever intend to give that place up as your home? A. No, sir. Q. Have you always intended to return to it and keep it as your homestead? A. Yes. Q. Did Mr. Talley ever at any time, or has he had at any time since you have been married, a home or a residence in Tennessee? A. No, sir."

Defendant Long in his brief sets out the following excerpts of the testimony of Mrs. Talley:

"Q. But on this particular occasion (referring to the time that he removed to Tennessee) didn't he see you and tell you that he was going to Tennessee to live? A. He knew I never wanted to go to Tennessee. Q. That isn't it at all, Mrs. Talley. I will ask you if he didn't tell you that he was going to Tennessee to make his home? A. I wanted to see him because I wanted to see the children; I used to cry night and day to see the children. Q. You refer to the time you went to Tennessee? A. It was at the time when he told me ne was going away. Q. Didn't he tell you here in Oklahoma, or in Tennessee, that he was going to make his home in Tennessee? A. I went up to his office because I wanted to see the children and he told me he was fixing to leave. Q. That was about the time he sold the furniture, that is, a part of the furniture and shipped the rest of it? A. I asked him what he was going to do with the furniture and he told me I could have it and send for it. I knew that was my home, why did I want to take the furniture out? So in the meantime he hurriedly packed the furniture and shipped it before I knew anything about it. Q. Then told you about it after he had shipped it? A. Yes, sir. Q. Didn't he ask you to come and go with him to Tennessee and make your home there at that time? A. He said something about wanting to sell the home, and I refused. Q. I understand, but didn't he ask you to come and go with him to Tennessee to make his home? A. I wanted to go see the children, but I didn't agree to make my home. Q. That is not what I am asking. A. I don't think he had any intention to make his home. Q. That is not what I asked you at all. The Court: Just answer my question. Q. I will ask you a plain, simple question; if you will just kindly confine your answers to my questions,

we will get along quickly. I will be just as polite and agreeable as I possibly can. What I want to know is this, didn't he tell you that he was going to Tennessee to make his home and asked you as his wife and the mother of his children to come and go with him and make your home with him and the children in Tennessee? A. He told me I could go over there to see the children and stay there for the summer. Q. Didn't he ask you to go with him to Tennessee to make your home there, isn't that true? A. He said something about wanting me to go. Q. What did you say? A. I wanted to go see the children; he said I had a chance to go so I would go."

Defendant Long then says in his brief: "It was practically admitted that when she returned to Tulsa in March, 1917, her purpose was to spend the 'Passover' with her mother, she being a Jewess. On direct examination she testified, referring to her coming to Tulsa, that she wanted to come home for the 'Passover.'—

" 'Q. What do you mean by home? A. Tulsa. Q. What did he say about it? A. He didn't want to let me come back. Q. Did you go anywhere to spend the 'Passover' that year? A. I came back to Tulsa.' "

Defendant Long contends that the trial court's findings of fact that the property in controversy was impressed with the homestead is clearly against the weight of the testimony. We cannot agree with this contention. We think the testimony so well supports the findings of fact of the trial court that had it found otherwise its findings would not have been supported by the testimony. In weighing testimony in the legal balances we must use the Constitution and laws as the weights by which its sufficiency is to be determined. In this state the Constitution has defined what the homestead shall consist of. Section 1, art. 12:

"The homestead of any family in this state, not within any city, town, or village, shall consist of not more than one hundred and sixty acres of land, which may be in one or more parcels, to be selected by the owner. The homestead within any city, town, or village, owned and occupied as a residence only, shall consist of not exceeding one acre of land, to be selected by the owner: Provided, that the same shall not exceed in value the sum of five thousand dollars, and in no event shall the homestead be reduced to less than one-quarter of an acre, without regard to value: And provided further, that in case said homestead is used for both residence and business purposes, the homestead interest therein shall not exceed in value the sum of five thousand dollars: Provided, that nothing in the laws of the United States, or any treaties with the Indian Tribes in the state, shall deprive any Indian or other allottee of the benefit of the homestead and exemption laws of the state: And provided further, that any temporary renting of the homestead shall not change the character of the same when no other homestead has been acquired."

Defendant Long is not contending that the first part of the first proviso, "That the same shall not exceed in value the sum of five thousand dollars," prevents it from being impressed with the homestead. Therefore, we are not passing upon that question or expressing any opinion, for it is not before us in this case.

Defendant Long insists the law by which this evidence is to be weighed is as set forth in his brief, from which we quote:

"Section 3350 of the Revised Laws of 1910 is as follows: 'The husband is the head of the family. He may choose any reasonable place or mode of living and the wife must conform thereto.'

"Section 3342 of Revised Laws of 1910 is in part as follows: 'The following property shall be reserved to the head of every family residing in the state: First. The homestead of the family, which shall consist of the home of the family, whether the title to the same shall be lodged in or owned by the husband or wife.' And section 3344 provides that the homestead exemption herein provided must not be construed to apply to a nonresident.

"Section 3350 of our statute above quoted is declaratory of the common law and is consonant with the great weight of authority and with reason and justice.

"In Ruling Case Law, vol. 9, page 543, is the following statement: 'Matrimonial Domicile; General Rules: — Following the rule established at common law, a woman on her marriage loses her own domicile and acquires that of her husband; and the matrimonial domicile is presumed to be that of the husband at the time of the marriage. In general, this rule governs no matter where the wife actually resides. Under this rule it has been held that in a suit for divorce based on the ground of a wife's desertion of her husband, the legal fiction that a wife's domicile follows that of her husband gives jurisdiction to the court of a state to which the husband had removed and in which he had resided for the time required by the statute, although the marriage took place and the desertion arose in the state in which the wife continued to reside. However, a man cannot change the matrimonial domicile by abandoning his wife and going into another state to reside. Though the husband has the legal right to determine the place of abode of the family, and the wife must submit to his decision, this power must be exercised in a reasonable and just manner. It cannot be exercised arbitrarily, nor used as a means

of procuring a dissolution of the marital relation.'

"And a large number of authorities are cited in support of this statement of law. In 19 Corpus Juris, page 414, it is stated as follows: 'Married Women. 1. In General. Following out the theory of an identity of person, the law fixes the domicile of the wife by that of the husband and denies to her during cohabitation the power of acquiring a domicile of her own separate and apart from him; and she cannot during such period of cohabitation effect a separate domicile by her intention that his domicile shall not be hers, even though assented to by him. The domicile of the husband is that of the wife only when the husband provides a domicile where the wife may go and stay at her will. Under modern statutes affecting the status of married women, it has been suggested that there is no reason why a wife may not acquire a separate domicile for every purpose known to the law, and it has been held that she may do so whenever it is necessary or proper, as where the husband has forfeited his marital rights by misconduct. But the domicile of the husband is at least prima facie the domicile of the wife.' And a multitude of cases are cited in support of the rule as above stated, including the decisions of the Supreme Court of the United States, the different Federal Courts and of almost every state in the Union, as well as England and Canada. The following cases, selected almost at random, show the application of the rule by the Supreme Court of the United States and by the Supreme Courts of other states: Peter Lee Atherton v. Mary G. Atherton, 181 U. S. 155, 21 Sup. Ct. Rep. 544; John W. Haddock v. Harriet Haddock, 201 U. S. 562, 26 Sup. Ct. Rep. 544; Anderson et al. v. Watts. 138 U. S. 694, 11 Sup. Ct. Rep. 449; Cheely v. Clayton, 110 U. S. 701, 705, 4 Sup. Ct. Rep. 328; Modern Woodmen of America v. Hester (Kan.) 71 Pac. 279; Town of Waterton v. Greaves, 50 C. C. A. 172, 112 Fed. 183, 56 L. R. A. 865; Petty v. Petty (Ind.) 85 N. E. 995; Sneed v. Sneed (Ariz.) 123 Pac. 312; In re Wickes' Estate (Cal.) 60 Pac. 867."

In the case of DeVry v. DeVry, 46 Okla. 254, 148 Pac. 840, Commissioner Devereux says:

"The contention of the plaintiff in error is that the husband has the right to choose the domicile of the family, and it is the duty of the wife to accompany and live with him in the home so selected, unless there be good reason for her refusing to do so, and that a failure of the wife so to do is abandonment, authorizing a divorce. There can be no question that this statement of the law is correct. Buell v. Buell, 42 Wash. 277, 84 Pac. 821; Franklin v. Franklin, 190 Mass. 349, 77 N. E. 48, 4 L. R. A. (N. S.) 145, 5 Ann. Cas. 851; 14 Cyc. 612."

The foregoing cases cited by defendant Long may state the law correctly on the questions before the court in the respective cases, but it does not apply to the questions presented in this case. The husband may select the domicile, and it may be the duty of the wife to reside with him at the domicile so selected by him. On her refusal so to do, he may be entitled to a divorce unless she establishes a good cause for her refusal.

The Constitution and laws of Oklahoma relating to homesteads are for the benefit of families residing in this state. But the family cannot be deprived of the homestead without the consent of both husband and wife when that relation exists.

It is undisputed that this property was once impressed with the homestead. In Alton Merc. Co. v. Spindel et al., 42 Okla. 210, 140 Pac. 1168, it is said in paragraph 3 of the syllabus:

"When property has once been impressed with the homestead character, no act or omission on the part of the husband, without the consent of his spouse, can result in an abandonment of the homestead by the family. The homestead is for the benefit of the entire family, and such joint interest is to be regarded as paramount to the rights of any individual member thereof."

Any act on the part of defendant Haskell B. Talley, selling part of the household goods, shipping part of them to Tennessee, renting out the homestead, or his going to Tennessee, cannot result in an abandonment of the homestead without the wife's consent. Clearly, under the evidence she did not consent. She refused to sign a deed to convey it away. She was clinging to this homestead as the last plank saved from her shipwrecked marriage relation with Haskell B. Talley. She was saving it as a refuge for herself and her children.

The question is not what was the intention of Haskell B. Talley about abandoning this home, but what was the intention of the plaintiff. Haskell B. Talley's intention was to abandon the home and thereby divest it of its homestead character so that he could sell it without the consent of his wife. If the husband's intention to abandon the homestead is sufficient, then all that is necessary for him to do is wait for an opportunity when his wife is away from home, move out the furniture, and then convey it free from any homestead lien. The last proviso of section 1 of the Constitution, supra, says:

"And provided further, that any temporary renting of the homestead shall not

change the character of the same when no other homestead has been acquired."

By taking his wife to live with his mother from July, 1916, to March, 1917, while he was trying to regain his health and get into a training camp, he did not thereby acquire another homestead. The renting of the homestead by defendant Talley was temporary, for no other homestead had been acquired. He had not even established a home for his family, but they were living with his mother. When the husband attempts to sell the homestead without the consent of his wife, great latitude must be allowed for her acts. The wife may consent to rent the homestead and voluntarily accompany her husband to another state without losing her rights in the homestead. If this were not the law, she could be placed in a bad plight by a husband who wanted to take advantage of her and dispose of the homestead. If she refused to go, he might use her refusal as grounds for a divorce; if she did go, she would lose her homestead rights. It must be made clearly to appear that she voluntarily intended to relinquish and did abandon the homestead, and that another homestead has been acquired, before her husband can convey it without her consent given as required by law. Where she persistently refuses to sign a deed to convey it and continues to claim her rights to it as a homestead, it cannot be said she intended to abandon her homestead rights.

It is not even contended that Pearl Talley ever consented to the sale of this property to defendant Long. Even when defendant Talley threatened to kill her and she consented under these threats to sign a deed, when she was able to escape without signing it she made her escape, and never has signed it. Defendant Long knew it was the homestead, and that the title would not pass to him until Pearl Talley signed the deed. His money was not paid to defendant Talley, but put in escrow so it would be safe until he obtained the signature of Pearl Talley to the deed, or could get some court to say that she could be deprived of the homestead without her consent. The findings of the court are in full accord with the evidence.

We do not think the court committed any error in applying the law to the facts. Section 2 of article 12 of the Constitution reads:

"The homestead of the family shall be, and is hereby protected from forced sale for the payment of debts, except for the purchase money therefor or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon; nor shall the owner, if married, sell the homestead without the consent of his or her spouse, given in such manner as may be prescribed by law; Provided, nothing in this article shall prohibit any person from mortgaging his homestead, the spouse, if any, joining therein; nor prevent the sale thereof on foreclosure to satisfy any such mortgage."

Pursuant to this section of the Constitution the Legislature prescribed the manner in which the spouse may consent by enacting section 1143, Revised Laws of 1910, which reads:

"No deed, mortgage or other conveyance relating to real estate or any interest therein, other than for a lease for a period not to exceed one year, shall be valid until reduced to writing and subscribed by the grantors; and no deed, mortgage or contract relating to the homestead exempt by law, except a lease for a period not exceeding one year, shall be valid unless in writing and subscribed by both husband and wife, where both are living and not divorced or legally separated, except to the extent hereinafter provided."

This court has just recently construed section 2 of the Constitution, supra, and section 1143 of the statutes, supra, in Case No 10190, Hawkins v. Corbit, 83 Okla. 275, 201 Pac. 649, in which it is held:

"Under the above provisions of the Constitution and laws of Oklahoma, the homestead, exempt by law, cannot be alienated except by a written instrument joined in and subscribed by both husband and wife where that relation exists."

See Pettis v. Johnston, 78 Okla. 277, 190 Pac. 681; Cressler v. Brown, 79 Okla. 170, 192 Pac. 426; Whelan v. Adams et al., 44 Okla. 606, 145 Pac. 1158; Shanks v. Norton, 79 Okla. 93, 191 Pac. 170; Elliott v. Bond, 72 Oklahoma, 176 Pac. 991; Carter Oil Co. v. Popp, 70 Oklahoma, 174 Pac. 747; Kelly et al. v. Mosby et al., 34 Okla. 218, 124 Pac. 984; Dickinson v. McLane, 57 N. H. 31; Howell, Jewett & Co. v. McCrie, 36 Kan. 636, 14 Pac. 257; Wallace v. Travelers' Ins. Co., 54 Kan. 442, 38 Pac. 489; Locke v. Redmond, 6 Kan. App. 79, 49 Pac. 670; Morris v. Ward, 5 Kan. 239; Bird v. Logan et al., 35 Kan. 228, 10 Pac. 564; Berry v. Berry, 57 Kan. 691, 47 Pac. 837; Withers v. Love, 72 Kan. 140, 83 Pac. 204; Terrant v. Swain, 15 Kan. 146; Chambers v. Cox, 23 Kan. 393; Coughlin v. Coughlin, 26 Kan. 116; Warden v. Reser, 38 Kan. 86, 16 Pac. 60.

The contract to sell the homestead to defendant Long was not joined in by plaintiff,

therefore it was void, and if void, defendant Long could not assert any rights under it. He cannot complain of a decree of court that cancels a contract under which he cannot assert any rights.

Finding no reversible error, the judgment of the trial court is affirmed.

HARRISON, C. J., and KANE, JOHNSON, and KENNAMER, JJ., concur.