Johnson v. Samuelson.

HERMAN JOHNSON v. S. J. SAMUELSON *et al.*

No. 13,460.   (76 Pac. 867.)

SYLLABUS BY THE COURT.

1. HOMESTEAD AND EXEMPTIONS — *Joint Consent to a Lease.*   Joint
consent of husband and wife to a lease of the homestead may ex-
ist, although the lease was signed by the husband only, when the
wife was not present but was several miles distant from the place
of execution.

2. ———— *Consent of Wife May be Shown in Proof of Joint
Consent to a Lease.*   Acquiescence of the wife in the possession
of a tenant of homestead property, her failure to object to his
cultivating the land and planting a crop thereon, and her friendly

relations with him for several months after his entry under a lease for a term of years of which she had knowledge, signed by the husband alone, the validity of which is attacked later for lack of consent thereto, are facts competent to be shown in evidence to support the claim that the wife consented to the lease jointly with her husband before, and at the time of, its execution.

3. ——— *Case Distinguished.* The case of *Durand v. Higgins,* 67 Kan. 110, 72 Pac. 567, distinguished.

Error from Saline district court; R. F. THOMPSON, judge. Opinion filed May 7, 1904. Reversed.

STATEMENT.

THIS was a proceeding in forcibly entry and detainer. The case was tried originally before a justice of the peace, and afterward on appeal in the district court. In the spring of 1901 S. J. Samuelson was the owner of two quarter-sections of land adjoining each other. He occupied one of the quarters as a homestead with his wife Christina. At the time mentioned plaintiff in error was living in Colorado. He wrote to Algot Johnson, an acquaintance then living a few miles from Samuelson, that he desired to rent a farm. Algot Johnson, in company with one J. P. Drivets, called at the Samuelson home during the month of March and talked with Samuelson and his wife about renting the farm to Herman Johnson. Drivets testified that Mrs. Samuelson said Johnson could have the land—that is, the two quarters. They both said they would rather rent it on shares for three or five years. In April, 1901, Herman Johnson came from Colorado and called at the Samuelson farm with Algot Johnson. They talked about renting the land Mr. and Mrs. Samuelson were both present. Both stated that plaintiff in error could have the land for three or five years at a rental of one-third of the grain stored in the granary on the place, and fifty dollars

additional for the pasture and meadow. Johnson told them he would accept the terms. Mrs. Samuelson directed that they go to Salina, about five miles distant, and have the lease drawn by one Ryberg, her nephew, then clerk of the court. The witness Algot Johnson testified upon cross-examination as follows :

"Ques. Well, was there anything said there in that conversation about when Herman Johnson would get possession of the premises? Ans. Yes, sir.

"Q. What was said about that? A. He said he could start to plow there and put out the wheat in the fall and he could write the lease for the 1st of August, but he couldn't get the house, the Emil Samuelson house, the one he lived in, before the 1st of March, 1902.

"Q. What about the other house—when could he get that? A. Mrs. Samuelson said after they moved to town.

"Q. Now, I am asking you what was said in Mr. Ryberg's when Mrs. Samuelson wasn't there? A. Yes, sir ; Mr. Samuelson said if they moved to town or went to Sweden he could have the house.

"Q. He was to reserve the home place—that is the house on the farm that he was living in—until he moved to Sweden or moved to town ; he was to reserve that? A. Yes, sir.

"Q. And if he didn't do that, then he was to get the home place? A. Yes, sir ; the house."

On redirect examination the witness testified that Mrs. Samuelson said they (meaning herself and husband) had already bought a house in town. She said she did not know when they would move ; they might go to Sweden or Salina ; then Mr. Johnson could move into the house.

Mrs. Samuelson was called as a witness for plaintiff below, plaintiff in error here. She testified that before her husband went to Salina to have the lease prepared he told her he was going. She said : "All

right; have a lease written and rent the land for one year only.'' She testified that her husband returned from Salina in the afternoon, and that she did not see the lease. She further testified :

"Ques. You saw the lease he had with him, did you? Ans. No, sir.

"Q. When did you first see it? A. When we had a notice from Pete Drivets and from Johnson that he was going to drive us out of our home; then I saw the lease for the first time.

"Q. You knew there was a lease in existence before that time. A. Yes, sir.

"Q. You knew your husband came to Salina to make the lease? A. Yes, sir.

"Q. But when you went home you say you did n't see it? A. No, sir; I did n't see it.

"Q. Well, you knew both quarters had been leased to Johnson on that day? A. Yes, sir; my husband said, 'I rented out the land.'

"Q. Did you ask him for how long? A. He said, 'For three years; do you want to see the lease?' and I said, 'No, sir.' I was angry; he had done that against my will.

"Q. That was the day the lease was written? A. Yes, sir.

"Q. And you became angry right off? A. Yes, sir; it was against my will.

"Q. Now, when did Johnson put in an appearance and begin working the land? A. In July he came down.

"Q. Were you still angry then? A. I was angry because I knew I did not like him. I knew he had a right to work the land, and I had nothing to say.

"Q. Did you tell Johnson then you was angry because he had rented the land for three years? A. No, sir.

"Q. As a matter of fact, you pretended to be kind to him? A. Yes, sir; I did all I could for him.

"Q. You did n't seem toward him to be angry or disturbed about anything? A. No, sir, I guess not; it would have done no good.

"Q. Now, while Johnson was there putting in 170 acres of wheat—that is about what he put in, was n't it? A. Yes, sir.

"Q. Where did he board? A. With me; and he bought some little stuff for himself that he ate when he wanted between meals; but he ate nearly every meal at our table, but sometimes he had a little crackers.

"Q. He had a tent in your yard there? A. Yes, sir.

"Q. He cooked for himself awhile? A. He had some things for himself.

"Q. And you said to him, in substance, that that might not be best for him, or he would catch cold, and you invited him in? A. Yes, sir; I told him to come in and eat what we had on our table.

"Q. And from that time on until he left for Colorado he boarded at your table? A. He did n't pay any board, and we did n't ask him anything, but he ate some of his own things and some of ours."

The written lease mentioned was dated April 29, 1901, and let the land for a term of three years from August 1 of that year, the lessor to receive as rent one-third of the grain raised on the land, and fifty dollars a year additional in cash for the pasture and meadow. It was signed by S. J. Samuelson, the lessor, and by Herman Johnson, the lessee. Early in July, 1901, the lessee brought from Colorado several horses and a wagon, and commenced plowing and putting in a crop on the land. He plowed about ninety acres of ground on the homestead quarter and seventy or eighty acres on the other quarter, prepared the land for seeding, and sowed it to wheat. There was no objection on the part of either Samuelson or his wife during this time. When he finished seeding he returned to Colorado for his family, and came back with them in February, bringing more horses and wagons. There was no objection to his resuming

farming operations until February 25, 1902, when Samuelson procured attorneys, who notified Johnson that the lease to the homestead quarter was terminated because not consented to by his wife, and that his right to the other quarter was ended because Johnson had not farmed it in a proper manner. Early in March thereafter Johnson began plowing and was put off the land by Samuelson. He then brought this action to recover possession of the land described in the lease.

The above facts appeared in the testimony offered in his behalf in the district court. After he had rested, the court sustained a demurrer to the evidence and rendered judgment against him for costs. He complains of this, and has come here by proceedings in error.

*Z. C. Millikin*, for plaintiff in error.

*C. W. Burch*, and *T. L. Bond*, for defendants in error.

The opinion of the court was delivered by

SMITH, J. : If there was sufficient evidence introduced by plaintiff below from which the jury might fairly infer that Mrs. Samuelson gave consent to the lease jointly with her husband, then the demurrer to the evidence was erroneously sustained. It is the contention of counsel for defendants in error that the witnesses Algot Johnson and Drivets, in repeating the conversations had with Mrs. Samuelson respecting the terms of the lease, testified that she reserved the house in which she lived with her husband, and that the lease having been executed and delivered by Samuelson without this reservation, her lack of consent appeared plainly. It must be remembered that there was testimony to the effect that on the day the

lease was drawn Mrs. Samuelson, in the presence of plaintiff below and Algot Johnson, stated that the former might have the land for three or five years from August 1, 1901. Immediately thereafter Mr. Samuelson, Algot Johnson and plaintiff went to Salina and had the lease drawn. Respecting the reservation of the dwelling-house, plaintiff below testified that Mrs. Samuelson said nothing about having bought a house in town into which she and her husband would move. This was in contradiction of the testimony of Algot Johnson, which tended to show that Mrs. Samuelson reserved the farmhouse until they should move to Salina. It was for the jury to reconcile the testimony of the witnesses. They could give credit to any of them.

In the brief of counsel for defendants in error it is said that Mrs. Samuelson did not see the lease or know its terms for almost a year after its execution. This is not borne out by the record. In her testimony set out in the statement she admits receiving information from her husband on his return from Salina that he had leased the land for three years. He offered to let her see the lease, but she refused to look at it. This was on April 29, 1901. Without a word of protest or objection from Mrs. Samuelson, the tenant proceeded to plow and sow wheat on about ninety acres of the homestead quarter and seventy or eighty acres of the quarter adjoining. Most of the time be boarded with defendants in error, and when he left in the spring to fetch his family from Colorado he left his belongings in the custody of the Samuelsons. Such conduct on the part of the latter was at variance with their claim asserted afterward that the tenant had no possessory rights on the premises, and tended in some degree to show a previous consent to the terms of the lease as drawn.

It is contended that because Mrs. Samuelson remained at home when her husband went to town five miles distant and executed the lease, joint consent was impossible; that their minds did not meet; that there was not a present consent at the exact moment the instrument was signed and delivered, which, it is insisted, is essential to an alienation or encumbrance of the homestead. We cannot give sanction to this view. The constitution of this state requires joint consent to an alienation, not a joint act of alienation. If the wife in this case agreed to the conditions of the lease substantially as they were afterward set down in the written instrument before its execution, and agreed that her husband should go to town and reduce the contract with the tenant to writing, and the husband carried out the arrangement, and afterward, with knowledge of the lease and its duration, she made no objection for nearly a year to the tenant's occupying and farming the land, such conduct was sufficient to be submitted to a jury in support of the claim of joint consent.

The case of *Durand v. Higgins*, 67 Kan. 110, 72 Pac. 567, is not at variance with what is said above. There the question was sharply presented by a finding of the court to the effect that the wife, prior to the signing of a deed, expressed herself as willing to join in its execution, but did not because it was stated that it was not necessary that she should do so, and after its execution and delivery she expressed herself as being satisfied with it. It was held that there was no joint consent for the reason that at the time of the execution of the deed, which was the only time the husband was shown to have consented, the wife did not. In the present case there was a continuous consent on the part of the husband, and we think the testimony

tended to show a continuous consent on the part of the wife from the time negotiations were begun to and including the time the lease was executed and delivered. Consent, of course, must precede alienation, but evidence of conduct of one of the parties whose consent is necessary, in recognition of the conveyance or lease, after the execution and delivery of the instrument, may be shown for the purpose of throwing light on the essential question of whether there was an anterior consent. (*Sullivan v. Wichita*, 64 Kan. 539, 68 Pac. 55.)

Again, when notices were served on Johnson to vacate the land in the spring of 1902, he asked Mrs. Samuelson the reason for such action. She answered that he had forfeited his contract; that he had not done proper work in harrowing, plowing, etc. No assertion was then made of lack of consent on her part, which was nearly a year after the execution of the lease. The assertion that the lease lacked consent of husband and wife seems to have been an afterthought. The tenant heard of no such claim while he was expending his time and labor in preparing the soil and planting a crop.

We think the case should have been submitted to the jury. The judgment of the court below will be reversed, and a new trial granted.

All the Justices concurring.

BURCH, J., not sitting, having been of counsel.