THE NATIONAL BANK OF NORTON, *Appellee*, v. ELIZABETH DUNCAN et al., *Apellants*.

No. 17,718.

**SYLLABUS BY THE COURT.**

HOMESTEAD—*Alienation*—*Husband and Wife*—*Joint Consent.* A homestead can be alienated or encumbered only by the joint consent of the husband and wife, and when the title is in the wife the written consent of the husband to mortgage on certain conditions is not sufficient when such conditions are not accepted.

Appeal from Norton district court. Opinion filed July 6, 1912. Reversed.

*L. H. Thompson,* of Norton, for the appellants.

*J. R. Hamilton,* of Norton, for the appellee.

The opinion of the court was delivered by

WEST, J.: The bank sued Duncan and wife to recover the balance on a note for $3000 and to foreclose a mortgage on their homestead at Norton which stood in the name of the wife. The petition alleged that on May 18, 1910, the defendants executed their promissory note for $3000 due in ninety days; that on that day the defendants orally and in writing agreed with the plaintiff to execute and deliver the mortgage; that but for such promise, on which plaintiff relied, the money would not have been advanced; that pursuant to such agreement Elizabeth Duncan did, on May 18, execute and

deliver to plaintiff her real-estate mortgage, and that
at that time J. H. Duncan, in writing, by a letter agreed
to join therein; that after he had received the $3000
he refused and neglected to join.  The contents of a
letter alleged to have been lost were also set forth, to
· the effect that Duncan wrote from Steamboat Springs,
Colo., about May 15, that he had struck a great deal
in horses and had bought sixty head and had drawn a
sight draft for $3000 which he hoped the bank would
honor "and we will give you a mortgage on our Norton
property to secure you.  I have written my wife about
it and told her to call at your place and make note and
mortgage."  The petition further alleged that on May
13 there was paid and credited on such indebtedness
$2000, that afterwards Duncan overdrew his account in
the sum of $667.89, and therefore judgment was prayed
for $1667.89 and interest.  The answer alleged that
the property was the homestead of the defendants and
that they had at no time jointly alienated or encum-
bered the same.  The testimony, among other things,
showed that before the transactions in question Duncan
had gone to Colorado and left a note at the bank for
$500 to cover any demands he then thought he might
need in addition to a credit of nearly $200 which he
then had.  On May 18 he wired from Steamboat
Springs to the bank to wire the bank there that his
check was good for $3000 for three loads of horses,
"letter coming."  On the same date the bank wired
and on the same day the cashier wrote that he was
surprised at receiving the message, that if the bank
had known before Duncan left that he wanted such a
deal it could probably have been arranged for, but that
upon such short notice it could not be done.  The letter
contained this sentence:  "We are awfully sorry that
matters are as they are but we can not help it."  May
20 Duncan wired:  "Have not recv'd letter.  Take care
of check mailed you mortgage recorded 60 head of
horses; wife will give you mortgage there on place;

it means $2000 to me; only want it 60 days." May 21 the bank wired Duncan: "Tried hard to arrange to take care of your deal but can not do so." June 24 the bank cashier wrote that a consolidation had taken place and Duncan was requested to send draft for the amount of the overdraft and balance on note of $1690.99. On May 26 the cashier procured Mrs. Duncan to execute a mortgage dated May 18. This was eight days after writing Duncan that the deal could not be handled and five days after wiring him to the same effect. Mrs. Duncan testified that the next morning she received a letter from her husband that he had checked on the bank for $3000 and hoped they would take care of it; that she went over to the bank where the cashier told her that he had received a message to that effect, but said, "We can not possibly take care of him, we absolutely can not take care of him." She also testified that on the morning of the 27th she asked the cashier for the papers she had fixed up the night before and that if she had received her mail she would not have given them up, to which the cashier replied that he had sent them out the night before to Kansas City and would have to wire there to stop them. It appears further that Duncan, on finding that the bank would not honor his draft for $3000, sold an interest in his contract to a party at Steamboat Springs and thereby raised the $2000 which was forwarded to the plaintiff bank. It appears that the bank did, after all, honor the draft, though just when it is difficult to tell from the abstract. At any rate Duncan had made the local arrangements for the money before he ascertained that the bank had concluded to take care of his draft, and by being compelled to make such arrangements he lost a large portion of the profits he otherwise would have realized. The mortgage was sent to him for execution, to which he replied on July 5:

"I am in receipt of yours of 30 enclosing mortgage for $3000 which you ask me to sign. You are cer-

tainly somewhat mistaken in what I owe the National Bank. This mortgage was made to cover check I drew on your bank which you wired me you could not take care of but two days later you wired me you had taken care of my check for $3000 so I sent mortgage on horses and this mortgage on property there was fixed by my wife, but during the time you wired me you could not take care of check and then you did. I let Mr. Poppin of Steamboat Springs, have interest in the horses and on May 28 he mailed you New York draft 50352 for $2000, so I only owed $1000. I afterward bought a few horses and gave you note for $500 with myself and wife on the note. . . . I enclose you the mortgage without signing and it don't look good to give note for $3500 when I am only indebted $1500."

On May 27 he wrote from Steamboat Springs that he was glad the bank had protected his paper, that if it had been done at once it would have saved him over a thousand dollars, that he had to let a local party in so that the profit would have to be divided.

By considerable industry we have been able to extricate the foregoing facts from the abstract and they appear to show (although the alleged letter was lost and the cashier's testimony was not had) that Duncan did advise the bank that he and his wife would make the mortgage for $3000 to take care of the draft for the same amount. That the bank repeatedly refused to protect the draft, but did finally do so, receiving a mortgage on the horses and a credit of $2000, and after this was done the bank procured Mrs. Duncan to execute the mortgage for the full amount and later forwarded it to Duncan for execution, and that he very naturally refused to execute a mortgage for $3000 to cover a debt which he claimed was $1500. It is familiar law that the homestead can be alienated only by the joint consent of the husband and wife, and while such consent need not always be in writing (*Dudley v. Shaw*, 44 Kan. 683, 685, 24 Pac. 1114; *Durand v. Higgins*, 67 Kan. 110, 72 Pac. 567; *Johnson v. Samuelson*, 69 Kan. 263, 76 Pac. 867), it must always be joint and

simultaneous (*Ott v. Sprague,* 27 Kan. 620; *Howell, Jewett & Co. v. McCrie,* 36 Kan. 636, 14 Pac. 257; *Wallace v. Insurance Co.,* 54 Kan. 442, 38 Pac. 489). Waiving the question as to whether Duncan could be held on a mortgage which he did not execute, by reason of the fact that he had promised in writing to join therein, we have here the case of a promise thus to join on a certain condition, which condition had not been fulfilled and had been repeatedly denied at the very time the execution by the wife was procured, and by no process of reasoning can the conclusion be reached that under these circumstances and conditions there was such joint consent as the law requires.

The only agreement to join in the mortgage was upon condition that the bank honor the draft so that the contract at Steamboat Springs could be carried out. The bank refused to protect the draft and Duncan was forced to make other arrangements and lose a large share of his profits. When the bank finally concluded to take care of the draft its delay had already caused the change and the loss, and even after Mrs. Duncan had signed and requested the return of the instrument her request was denied and the mortgage, said to be in Kansas City, was forwarded to Duncan in order to secure his signature, the bank knowing at the time that the wife, so far as she could, had withdrawn her consent. To hold that the bank could thus force Duncan to treat the mortgage which he had been requested to sign as his would be to permit one party to change another's contract and then bind him to it as changed.

While there is nothing in the pleadings to indicate it, the defendant's brief suggests that the matter was treated and decided as an equitable mortgage. But equitable mortgages are declared when the party's conduct requires such holding in order that an innocent party who has kept his agreement may not suffer loss by one who has failed to keep his. The bank is in no condition to claim that the instrument signed by the

wife only was a legal or equitable mortgage upon the homestead.

. "But an equitable mortgage can arise only from a specific agreement between the parties in interest. And there must be clear and unequivocal proof of the intention to create a mortgage and of the sum which it was to secure. . . . But in order to have this effect there must be a complete and binding agreement for the giving of a mortgage, and a mere proposal or offer to give a mortgage, not accepted or assented to by the other party, nor acted upon by him, will not amount to a mortgage in equity." (27 Cyc. 976, 983.)

Complaint is made that the court refused to quash the summons, but as there was an appearance and answer the error, if any, was waived.

The judgment is reversed and the cause remanded for further proceedings in accordance herewith.